The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Kindly be seated. All right. Ms. Templin? Good morning, Your Honors, and may it please the Court. Hannah Templin for Appellant Felicia Morgan. When the District Court granted the officers summary judgment and qualified immunity, it ignored key factual disputes that cut in plaintiff's favor. First, the Court ignored that Officer Gonzalez was on the scene for more than a half hour before he pulled the trigger, but failed to warn Bobby at any point. Second, the Court ignored that both Officers Gonzalez and Rood could see when officers' bullets impacted the window and that Bobby's gun caused no similar damage. And third, the District Court resolved key credibility disputes against plaintiff. For example, crediting Officer Rood's testimony that Bobby was using his fake gun to threaten officers over Bobby's contrary testimony that he did not. These errors flunked both the reasonableness inquiry in Barnes and the summary judgment standard. The Court should reverse on excessive force or, at minimum, vacate and remand for the District Court to redo its work. The Court should also reverse on the ADA. The District Court concluded that Charlotte had no duty to accommodate Bobby's mental illnesses because circumstances were, in its words, exigent from the start. But the record belies that conclusion. At minimum, the City could have taken openings to warn Bobby to stand down or used a mental health officer already on the scene. I welcome the Court's questions. I'll start by discussing the Court's grants of summary judgment and qualified immunity. Qualified immunity is improper when a right is clearly established, and cases like Cooper and Hensley clearly establish that when an individual is standing on his own property holding a gun, officers cannot use deadly force unless they both reasonably believe that he poses a threat and, where feasible, warn him. Viewing the record in the light most favorable to plaintiff, as is required at this stage, there are reasons to think, for all three officers, flunk summary judgment and that standard. I'll start with Officer Rood. Officer Rood fired a gun at Bobby for only one reason, he says, because he believes he saw, or he says that he saw Bobby tracking Officer Gonzalez with his gun, aiming it at him. But Bobby says differently. He says he never pointed a gun at officers. And for that matter, Officer Gonzalez, who was also looking at the same window, also says that he never saw Bobby point his gun at him. That dispute has to be resolved in Bobby's favor at this stage. And that makes the case look exactly like Cooper and Hensley. Bobby is simply standing in his window holding a gun and not pointing it at an officer. Officer Rood could not pull the trigger. To top it all off, there are reasons to believe that Officer Rood knew that Bobby's gun was fake. When he arrived on the scene, he talked to Officer Gonzalez. He knew that Bobby... What do you mean by the gun was fake? The gun was only firing blanks and not firing... It fired blanks, but it was a 9mm Magnum. But because it was firing... A 9mm Magnum. The gun... It was a legitimate gun that had been modified in the barrel some way or another. It wouldn't let a projectile through it. But it was a non-mm Magnum. Is that right? The gun looked real, yes, Your Honor. It looked absolutely real. It had been real, I guess, before somebody obstructed it. Yes, Your Honor. However, there's no dispute... And this young man was mentally impaired. Yes, Your Honor. However, there's no... How does he get a right to possess a weapon like this? The weapon was not real and could not fire bullets. Well, it held 15 rounds of ammunition that would go off. The weapon, as he possessed it, could not fire ammunition. And he carried it around under his arm in a holster. Correct? He did carry it under his arm, and that... In a holster under his, I think, his right arm. He did, Your Honor. And he claimed to be a police officer. Yes, Your Honor. And he threatened two women who were neighbors of his. Yes, Your Honor. He was going to blow their heads off with an expletive deleted. Yes. Is that correct? That is correct, Your Honor. And is that not a prohibited weapon under the firearm laws? Because it could not fire projectiles. Well, a frame is prohibited, the frame of a firearm, under the very same statute. Well, he... Under Section B. I don't believe he was... If you look at it, possess. I don't believe he's ever been charged with... And that's a felony for somebody who's mentally impaired to possess a firearm. Now, you can argue that this wasn't really a firearm, but you haven't got a very good argument. Well, to... Because the police officer saw that. Yes, Your Honor. They knew he carried a firearm. He carried this... I think you all, somebody even called it a toy gun. Yes, Your Honor. But it was a 9mm Magnum. Your Honor, the... That was fitted for 15 rounds. It sounded like real shots. It did, however, bullets were not impacted. It sounded like somebody was an active shooter. Yes, Your Honor. However, both officers, Gonzalez and Rood, on excessive force... Well, what... I mean, what do you... What would you expect a police officer to do? To wait until somebody that's firing in the vicinity and... Is an officer supposed to wait until somebody actively trains his gun on them before they can take action? Because by then, it's going to be too late. I mean, these folks are... What's he supposed to do? Negotiate with an active shooter? He'll get his head blown off. A couple of responses, Judge Wilkinson. First, yes, cases like Cooper and Hensley indicate that both you should warn... Why should he have to wait until somebody has him in a direct line of fire? He's certainly shooting all around in the vicinity. In Officer Gonzalez's case, the problem is that he noticed that officers' bullets were impacting the window, but not that Bobby's were. But going briefly to some of Judge King's... The barrel was obstructed somewhere or another. Presumably modified, I guess. I wouldn't think it was manufactured or something like that. And I wonder why he wasn't arrested on the spot before any of this happened. And that goes, too, on Felicia's ADA claim. Officers Tilson and Ellis... I don't know who that helps here, but it might not help you. When Officers Tilson and Ellis arrived on the scene, they knew he was carrying a gun or something that he said was a gun. He had told 911 operator that he had something that he said was a gun. Yes, but the bottom line here is that the plaintiff here would require... Even when an officer's life, very life, is in danger, he's still not allowed to take preventive action. Even when his life could be on the line. Respectfully, Your Honor, we disagree for a couple reasons. First, with Officer Gonzalez and Rood, the key point that we assert is that they knew their lives, or they should have known their lives were not in danger because there were no bullets impacting the window. Do you agree with me that they could have arrested him on the spot when they saw the firearm? We have maintained since the district court that Officers Tilson and Ellis could have arrested him. They could have frisked him and taken the gun away. And the fact that they did not do so, and they did not provide mental health support, and then they never once, both earlier in the encounter and then through the 30 minutes when all he was doing was popping behind a window and showing CDs and money, and his wallet never warned him to drop the gun, mean that the city and the officers violated the ADA in those circumstances. And moreover, the fact that Officer Gonzalez was on the scene... We have to deal here with the situation that the officers actually confronted. And they heard these shots go off. They sounded like shots. Actually, they were blanks. He was shooting very much in the vicinity. And you just don't... I don't think that our decisions, our Benton and Layton decisions, indicate that the police need to wait for a suspect to take aim before they can respond with deadly force. In other words, if they had to wait for the suspect to take aim at them before they could respond, we're going to have a great many more deceased police officers. It's that clear. Whether the weapon was actually aimed at Mr. Gonzalez, that may be in dispute. But the officer was absolutely within the gunman's line of vision. There's no dispute that this gun could have gone off, could have reached the officer. It could have inflicted fatal force. And the officer was plainly within the plainest line of vision here. Your Honor, especially with cases like Cooper and Hensley, the same was true there. An individual was carrying a gun, saw officers, and encountered them. However, in those cases, because the individual was not pointing the gun at officers and officers, especially in Hensley, had not taken the opportunity to warn, the court found that qualified immunity was improper. And especially for Officer Rue, who did not, Bobby at this point, was not firing the gun through the window. He was simply standing in the window. And there's a clear disputed fact whether he was aiming the gun at officers or simply standing there holding the fake gun. But Officer Gonzalez, for example, he was hearing gunfire. He was learning over the radio that the gunman had been discharging his gun, aiming it at officers, aiming the gun at officers, and refusing police commands. And then seconds later, he sees the gunman shooting out of his front window. Now, this is, I don't understand when people act reasonably to protect their own lives and those of their colleagues that they should be hauled up in a 1983 suit. I don't, I don't understand that. If you hear gunfire, if you heard over the radio that he was discharging the gun, that he was actually aiming the gun at officers, that he was actually shooting out of the front window, that he was refusing police commands, what more do you need? Judge Wilkinson, on the point of whether he was aiming previously at officers, will just note that this, too, is a disputed fact. Officer Skipper testifies that he believed Bobby was aiming the gun at him. But again, Bobby disagrees with that and says he never aimed the gun at Officer Skipper or any other officer. And body cam footage does not resolve that dispute. So at least as to Officer Skipper, on that point, there's a disputed fact. But turning back to Officer Gonzalez, regardless of what he was told on the radio and the fact that he saw Bobby firing something that looked like a gun out of the window, he also could see that what he thought was a gun was not firing real bullets impacting the window. And we expect officers to use common sense and to note things around them. Again, in cases like Cooper and Hensley, expect officers to be able to tell when somebody is threatening them with a firearm as opposed to simply holding the firearm. This is what reasonableness, the reasonableness standard, is about. And if Officer Gonzalez could see that there were no bullets coming from the gun, his belief that Bobby was posing a threat was unreasonable. The same is true for Officer Rood, both because there's a disputed fact that whether Bobby was pointing a gun at anyone in the first place, as well as the fact that he had discussed with Officer Gonzalez that Bobby had supposedly fired out of the window. Who bodied this gun? His mother or client? How did he end up with this gun strapped on himself and being mentally defective? Everybody agrees he's mentally defective, and that's prohibited by the Title 18. She does not know. She's had a deposition. This is a prop gun that presumably he ordered from online, the type of thing that would be used in movies. I believe originally would have come with an orange cap on it that fell off or was removed at some point. But she, at deposition, knows that he does not have a gun and asks him, a real gun, and asks him repeatedly whether he has one. And he had threatened the two neighbor ladies. What did he tell them? He was getting in altercations with the neighbors and had on previous occasions. He called the police to resolve that. What did he tell them? He told them that he wanted to blow their heads off. With what kind of a word stuck in there? A word that I'm not going to repeat. You're not going to repeat the word in the courtroom. You don't want to. I don't, Your Honor. But he told them that, and he had a gun strapped under his arm when he told them that. And at that point, Officer— Isn't that correct? He did, and Officers— How does that apply here, though? That maybe brings in this new spring court case that says you've got to look at all the circumstances. And that was several minutes before this, I guess, before the incident occurred. And the spring court changed the rules or emphasized the real rule since this case was decided by Judge Bell. Your Honor, I— And that's what they argue that that ought to be— or somebody argues it ought to be remanded to give Judge Bell a shot at the new case. Your Honor, my time has expired. May I answer the question briefly? It's up to Judge Wilkinson. Do you have anything further you want to— If I ask you a question, I think Judge Wilkinson will let you answer it. If what I said was a question. If you considered a question, I'm sure Judge Wilkinson will let you answer it. To very briefly answer, the initial interaction was not something known to Officers Gonzalez or Rood when they arrived on the scene. However, it does factor into the ADA determination of whether Officers Tilson and Ellis and the rest of the police department were accommodating Bobby's mental illnesses from the start. All right. Thank you. Thank you. Judge Gregory, do you have anything? All right. Mr. Bader? Good morning, and may it please the Court. Stephen Bader here for the three officers, Skipper, Gonzalez, and Rood. My colleague, Taylor Imperiali, is here for the City of Charlotte to address the ADA claim. This Court should affirm summary judgment for the officers on either one of two grounds. First, on the constitutional ground, because a reasonable officer on scene would have perceived Bobby to present a lethal threat given the totality of the circumstances. Specific as to Officer Skipper, he also has an additional argument that he never, in fact, seized Bobby, which would provide a separate basis to affirm summary judgment on that ground. And second, as to all the officers, this Court could affirm on the qualified immunity basis because Bobby did not have a clearly established right to be free from lethal force under the totality of the circumstances present here. What this Court has, or I'm sorry, what the Supreme Court has instructed in considering the constitutional prong is the three grand factors. The severity of the crime, the risk that the suspect presents to officers as well as to others, and then whether the suspect is evading police. All three of those factors are present in this case. What the record here shows is that after the initial encounter with Officers Tilson and Ellis, and after Bobby's making threats to his neighbors, he goes inside of his home where he fires a gun. The body-worn camera shows that Officers Tilson and Ellis, hearing that gunshot, believing that's a gunshot, take immediate action to try to secure this area. They move the neighbors away from the property. They clear the street in front of the home so that passersby are not at risk. Within about 13 minutes of that shot, again on the body-worn camera, Bobby shoots again. I should back up and say before that there's also a call for backup. As to Officer Skipper, he takes position behind Bobby's home. He's hearing these gunshots, and he hears that this is a call for service with an active shooter. He sees Bobby come outside of his house and shoot the gun. At that point, Officer Skipper announces himself and says three times, drop the gun, drop the gun, drop the gun. And Bobby doesn't do that. Instead, he retreats back into his house, and of course before that, Officer Skipper does try to shoot Bobby and does not hit him. Bobby goes back into the home, goes to the front of the window, which is where Officer Gonzales can see from his position behind a tree. Officer Gonzales is hearing radio traffic that there's been shots fired. He hears that there's been warnings given, instructions to drop the weapon, and that the suspect is not compliant. About 90 seconds between when there's the interaction with Officer Skipper, Officer Gonzales sees Bobby in his window, and he sees him fire his gun. And about five seconds after that, Officer Gonzales fires his single shot. But they say the window didn't break. They knew it was a blank? Your Honor, the fact that that window didn't break is one factor among many in the totality of the circumstances. So all the totality of the circumstances applies? Absolutely, and that is the accounting that the district court did. When you look at Joint Appendix 1668, it— Did they take into account the fact that he had threatened his neighbors and was carrying that 9mm cannon under his arm and it was loaded? I believe so, Judge King. I believe when you start at page 16— Why didn't they arrest him on the spot for having that? He's mentally impaired. Everybody knew he was mentally impaired. His mother was apparently giving him that gun to placate him and let him go around and act like a police officer. He showed one of the police officers his ID or showed somebody his ID. Correct? That's correct. I just— He was a police officer. He was a police officer carrying a 9mm under his arm, and he's mentally defective, and nobody arrested him. That's against the law, is it not? Well, I don't want to get too far afield other than to say that implicates things— You're not getting far afield. That's part of the facts leading up to the whole thing. But as to the— They didn't arrest him, and he ended up in a shooting incident. As to the three— He threatened those women at the time, and the police officers knew that. Well, as to the three officers that I represent, Judge King, their information is— That doesn't mean that maybe they are entitled to immunity. I don't know how that helps, but those are facts that I think relate to the totality of the circumstances. Well, they relate to the totality— They lead up to the circumstances. Absolutely. That's the totality of the circumstances. Absolutely, and I believe that the district court does that accounting starting— The shooter is mentally impaired. The one that they deemed the shooter was mentally impaired. He was firing blanks, and that somebody had gotten him a 9mm cannon to put under his arm and walk around as a police officer and threaten his neighbors. And the totality of those circumstances would justify lethal force by the three officers that found themselves in this situation. Well, it wouldn't be lethal force at the time. They knew it. One of them was standing there with him. Well— They knew they—one of them—didn't somebody handle the gun and hand it back to him? Right, between Tillis and Ellison, or Ellis and Tillison, I'm sorry, who are not parties to this case. As to these officers, though, those facts are relevant in that they inform the larger picture, which, as you point out, is somebody who apparently is mentally ill, who apparently has access to a weapon, who's apparently made threats to their neighbor, and who, after Officer Tillison is trying to speak with him, chooses to go back inside of his home and then fire off his gun, sparking this response. That is what my clients are hearing on radio traffic, and that's what they know as they come to this scene. And then they are seeing a scene that is deteriorating, starting when Bobby leaves his home— How many rounds did he fire altogether? Bobby? Bobby. I think seven. Did the post-incident investigation confirm that in the context of his firearm? I don't know the answer to that, Judge King. That's possible. Is that not on the record? I thought they investigated. It may be. What I can tell you is— How many rounds ran out of that 9mm? I don't know. If that's in the record— There were blanks, firing blanks. But there were 15 in it. Right. At least according to the—it's in one of your briefs. Right. And that's right. The picture of it. Well, right. Right. And I think that's right. My recollection is seven shots were fired between— So the totality of the circumstances analysis has never implied that we should not consider the present circumstances with which an officer was confronted. That's part of the total picture. And the present circumstances here were the fact that the officers knew that he was firing all shots and heard the shots, knew—saw the individual through the window, knew that they were within the line of fire, that the officers were within the line of fire, and they actually heard before they arrived on the scene. They actually heard the shots. This is not something where—in most of these excessive force cases, you don't have actual shots being fired. It's just a question of where the police acted precipitously in shooting someone who maybe never drew a gun or somebody who was fleeing or whatever. But this is a very different case. This is not a situation where somebody is fleeing. It's not a situation where somebody never drew a gun. And it's a situation where you actually hear the sound of what appears—they were blanks but all agree, understand, that they were actual—that they were indistinguishable from actual bullets. But I just want to point out that this is really different. And to say that officers can't act to protect themselves in a situation where they have heard actual shots from a scene in which they're about to arrive, that would carry these excessive force cases a real step further. Because I don't know of a situation where somebody has been heard to fire and shooting and the rest where it says the police officers are prevented from protecting their own lives. Maybe they should have arrested him and the rest, but I don't—that still doesn't get to the question that they were arriving on a scene in which they heard and saw actual shots being fired or blanks that appeared to be shots. And that's what I'm concerned about here is that we may be saying, even in a situation where officers heard gunfire and arrived at the scene from which the gunfire was proceeding, even in that situation they can't act to protect themselves. That's a real big step. I agree with all those comments, Judge Wilkinson, and just to kind of parry off them a bit, I mean, that's where this case is so different from Cooper and Hensley. It's altogether different from what we generally confront, which is a situation where nobody's drawing a weapon, nobody's firing a weapon, people are fleeing the officers, and they shoot first and ask later and everything. Here they have and have heard and are seeing an active shooter in a situation who has the officers well within his line of fire. And we haven't, as I know, taken the step of saying that officers are powerless to act in that situation. Now, the shots he fired, the seven, were just as loud as they would be if they had projectiles, right? Correct. Five blanks is just as loud. Got the same amount of powder. That's correct, Judge King, and the district court does make a notation that I also emphasize in the brief where Ms. Morgan's counsel in fact mistaken one of Bobby's shots for an officer's shot. But yeah, that's absolutely correct. Let me just conclude with this other remark. I think unless the court has any other questions on the constitutional prong, I think I've made my arguments and would rest on the briefs. But just as to Officer Skipper, there's a separate issue with him which deals with the fact that he didn't effectuate a seizure because he didn't actually hit Bobby. There's an argument here that he sort of effectively caused Officers Gonzalez and Officers Rude then to effectuate that seizure. I would just really offer two comments. I think first and foremost, the situation that Officer Skipper found himself in justified lethal force on its own. So even if there was a seizure, he would be entitled to qualified immunity. But secondarily, Officer Gonzalez as well as Officer Rude, they acted independently based on the circumstances in front of them. They did not choose to use lethal force because of what Officer Skipper did. So I think to suggest that that doctrine should be expanded on these facts simply would not be supported. And I think again we've covered the constitutional prong ground, but I would just add in conclusion that if the court for whatever reason... I mean anyone who engages in this behavior probably is mentally defective in a way. And so we can sort of roll back the time and say, well, this person was mentally defective. And I would think that still if we would go down the road of saying, well, you should have arrested this person or you shouldn't have arrested that person and the rest, it doesn't address the present circumstances with which these officers were confronted. And, you know, asking whether such and such individual should have been arrested and shouldn't or this person shouldn't have been arrested. You know, those... I mean, I understand that, but on the other hand, I don't know whether these officers were responsible for not arresting somebody or, you know, who... Could they have gotten close enough to arrest somebody or could they have arrested them beforehand? That's a whole lot of... That's a whole can of worms. It's a large can of worms. And it doesn't address the question that these officers were in present danger. That's the thing. And I think that you can look at the totality of the circumstances, but there are situations where asking whether a prior arrest would or would not have been justified and everything. I just think that's a can of worms. What's not a can of worms is the fact that these officers' lives could have been taken very easily, very easily. What's not in dispute is that he was told to drop his gun three times and he didn't. Three times, he didn't. And he continued firing, continued firing. And what is a police officer supposed to think? What are they supposed to think? Yes, and the body-worn camera certainly paints that picture. I thank the panel for the argument this morning. I would ask this Court to affirm summary judgment for the three individual officers. Thank you. Mr. Imperiale. Taylor Imperiale for Apelli City of Charlotte. May it please the Court. I'm speaking separately on the ADA claim against the City of Charlotte. The District Court was correct in granting summary judgment for the city on plaintiff's ADA claim. This Court does not require that officers provide additional accommodations once a suspect presents with an objectively deadly threat. To use the words of this Court in the Waller case, plaintiff's ADA claim asks this Court to lean far in the direction of impermissible hindsight to say that Mr. Morgan's injuries flowed from the city's not providing certain additional proposed and frankly novel accommodations. Accommodations that were unreasonable given the exigent circumstances with which the officers were presented. Why was that novel? Why do you say it's novel? It was broadcast that he had a history of mental illness. Yes, Your Honor. Is that right? Yes. As a matter of fact, an officer arrived there who had some training there and then decided that he was going to do it himself rather than call in an expert. So this is not the exigency. It's quite as much as you're talking about. You know, you got to start the film from the beginning, not at the end. Right? Am I wrong? That an officer made decisions? No. I know Bob. I know him personally. I know about his history of mental unwellness, and I can talk to him, right? Is that right? Yes, Your Honor. Okay. Right. And at some point, did he drop the gun and they gave it back to him? He dropped the gun. It fell out of his pocket, and Bobby picked it up himself. The officers didn't pick it up. But they let him do that. Yes, Your Honor. Put it back in the holster. Yes. Which was under his arm on the right-hand side. And they knew he had mental illness and not only had a history, but he was in episode. He was right at the time. They knew that. Your Honor, so two points. He was threatening, threatening, right? Because he had a problem with the neighbor. He thought they were disturbing him. So they know he was in a manic form. And he drops the gun and they let him have it back? First, Your Honor, the— Am I wrong yet? I'll get the facts before you give your— You're not wrong about anything you just said. Okay, go ahead. Now tell me now about this exercise. We're right here now. Yeah. So on the point of what the novel accommodation that's been requested is, is that appellant suggests that an accommodation would have been to seize Mr. Morgan. And whether they could have lawfully done that is not really a question before the court. What is a question before the court is whether not having seized him constitutes a failure to accommodate him under the Americans with Disabilities Act. See, that's a strong linkage right there. You have a history of it. He's in manic form right now. You know that personally. It's not like, well, this is a random person. That's your record. You're an old client right now. Please all get to know that. And you let him pick up the gun, holster it, and then let him go back into the house. And you say there's no linkage between that and what eventually happened. You want there to be a shooting? How could that be? What I'm saying is that – I mean, just logic now. I mean, you're a lawyer. I know you're a very smart lawyer. How could there not be a linkage between those things that happened right there and what ultimately happened? How is that not a linkage? Tell me that. I agree that if the officers had arrested him in the moment, the things that happened after might not have occurred. That's not to say, though, that it's an accommodation required by him. That was not a split-second decision, though. That's different. You can't allow something to go on and then to the point where, as Judge Wilkerson told me, you have officers there facing, I don't know whether it's a real gun or not, and shooting. But the point is, and the ADA claimed the whole idea, is that you had an opportunity of knowledge allowing him – not you, not you, but to me, your clients, and the city and the legend is found, because we're right here. That's a factual question. That's a factual question whether or not that – because I can see a clear logical connection, whether that fact may be – that may be to determine, but how can you say that you don't have a responsibility? We're not talking about to give him therapy on the scene. We're not talking about psychoanalyzing him on the scene. We're talking about removing a clear and present threat, given his manic – present manic condition they knew about. And that led to him going back in, wavering a weapon who they didn't see any glass break, but forget about that. Even without that, the officer may not – I understand in the pressure of time, you might say, well, I didn't know there was glass breaking or not. I hear the weapon being fired. Something being fired, I shoot. But that's what the crux of the ADA claim is against the city. Now, you tell me why that's not a factual question in that sense that you do have a responsibility. You agree, don't you, to do some things to help people that you know that are mentally ill. Yes, Your Honor. However, under the Waller case, the court does take into account the exigency of the circumstance in determining what a reasonable accommodation is under the circumstance. But this wasn't exigency. Not in that sense. It was not in exigency because he said, I can take care of this. And eschewed getting someone who had the expertise, because I can handle it. And handling it, part of it, on the facts, that's to be determined maybe another time. But in the Fourth Circuit, with summary judgment, those kinds of things, even qualified immunity, the facts, we consider that to be jurisdictional where it's still to be determined. Now, you might argue that that's exigency. But on this record, I'm not sure you consider that exigency. And you haven't disputed anything I just told you in terms of the facts, but you disagree in terms of the rule in that. So you don't think they have any responsibility. Your Honor, I see I'm out of time, but if I may respond. If Judge Wilkinson will allow you to answer, it's fine with me. Sure. But I haven't answered in a minute. Go ahead. I would say, first of all, the city did accommodate Mr. Morgan by having Officer Tilson, with whom he was familiar, come to the scene, and he had specialized training in dealing with folks with mental illness. Secondly, again, there is no authority for the proposition that a seizure is in and of itself an accommodation under the ADA. And finally, on the question of whether there's a factual question, both Waller and Saramath, precedents of this court, determined as a matter of law what was a reasonable accommodation in a given circumstance. As I understand it, I think there's some limit to the degree that we can afford or that we can require police officers to become psychiatrists. But in addition, the material facts here I don't think were in dispute. There may be some argument about his mental disease and what, but there are always going to be arguments if we open this door because there are always going to be questions about how somebody could embark upon this course of conduct if they weren't mentally defective. But the material facts here are not in dispute. The fact that he disregarded the officer's command to drop the gun, the fact that the officers heard the fire, the fact that the officers were in the line of defendant's fire, the fact that his firearm, as Judge King has aptly described, the fact that his firearm could easily have reached the officers and killed the officers, we might talk about what might have happened, but part of the totality of the circumstances are those circumstances with which the officers were confronted. And here the material facts are simply not in dispute. They're within the line of fire, for goodness sake. The officers have heard the gunshot, or what appeared reasonably to be the gunshot. They disregarded the commands. They were shooting out of a front window. This is not the kind of excessive force case we have heard before because they don't involve an active shooter who is actually firing something that looks like the kind of firearm that Judge King has described. And what Judge King described was not a toy gun. It was a lethal weapon, and the officers were within range of something whose lethal capability, to use a summary judgment, was not in genuine dispute. And you come at the end of the road to that, and one can debate the ins and outs of mental illness, but I don't think the fact that one can debate that is sufficient to defeat summary judgment where the facts right before the officers' own eyes gave them a reasonable belief that their lives could be terminated. Those facts are not in genuine dispute. Those facts included the fact that he actually had a second gun. That's correct, Your Honor. That's right. Unless there's no further questions, I'll take my seat. Thank you, Your Honor. Thank you, Your Honor. I just want to start with the ADA claim that we finished on. My friend on the other side said that Waller supports their position that the requested accommodations are novel. But in fact, Waller sharply illustrates how the city's response from the beginning on the mental health accommodation was deficient. In Waller, unlike this case, circumstances were exigent from the beginning. There was an active hostage situation, a man holding his girlfriend hostage at knife point. And yet, in those two hours... Did his mother sponsor him carrying all these guns and dressing up like a cop and having an ID for a policeman? No, his mother ensured that he did not have a real gun. He had a real gun. He had two guns. This was not something that she had ordered or sponsored of him. He had a holster to put it in. He had ammunition that's fired and made noise, big noise. And the mother is the plaintiff here. She stated deposition. She was not aware he had purchased this gun and he had apparently got it online from a store that sells prop guns. Returning briefly to the ADA claim, in Waller, the city there actually brought in a hostage negotiator to speak with him. Here, by contrast, the only officer who had mental health training on the scene, Officer Tilson, spoke with him for 30 seconds, watched him drop the gun before leaving. Excuse me. I think the point is being made that it's really not entirely fair to sort of load on the officer's shoulders that there might have been a prior arrest. Well, there may not have been. There may have been. I don't know. But the point Judge King makes seems to me entirely valid that one of the things that contributed to the situation is the mother's relationship with the son and the mother's desire to either give him a weapon that would mollify him or whatever. But that's part of the totality of the circumstances here. And whether one looks at the officer's prior arrest or non-arrest or whatever it should have been, or whether one looks at the mother's conduct, none of it changes what the officers were confronted with with an active shooter who had them well within their line of fire. That's the point. Judge Wilkinson, setting aside the officers on the excessive force claim, the ADA claim begins at the beginning of the interaction when Officers Tilson and Ellis arrived on the scene. And at that point, it was not nearly an active shooter situation. It was Bobby who called 911. Officer Tilson, who had previous experience with him, did not believe that he was acting out of the ordinary and thought he could resolve the situation on his own without calling in backup. Officer Tilson and Ellis allowed him to drop the gun without taking it away from him. And then the only officer with specialized mental health training went to chat with the neighbors for 10 minutes as opposed to trying to talk him down from his maniac phase, as Judge Gregory discussed previously with my friend on the other side. Starting from the beginning of that, officers did not provide basic accommodations that officers in cases like Waller did. Where in Waller, they brought in a specialized hostage negotiator, they repeatedly tried to contact the individual who was holding a hostage, and they tried to contact other family members to try and come up with a way to address his mental illnesses before the situation got even further out of hand and only then use lethal force. Officers Tilson and Ellis could have done that from the beginning here, but the fact that they did not means that they did not attempt to accommodate Bobby's mental illnesses under the ADA. For these reasons, we would ask that the court reverse the grant of summary judgment or at minimum vacate and remand on excessive force. Thank you. We thank you both. We'll adjourn court and we'll come down and say hello. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Robert B. King, Roger L. Gregory